# In the United States Court of Federal Claims

### No. 15-914C
### (Bid Protest)
### (Filed: November 17, 2016)[1]

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * | | |
| | * | **Post-award Bid Protest; 28 U.S.C.** |
| **CADDELL CONSTRUCTION** | * | **§ 1491(b)(1); Motion for Judgment on** |
| **COMPANY,** | * | **the Administrative Record; Lowest** |
| | * | **Priced Technically Acceptable** |
| **Plaintiff,** | * | **Procurement; Subcontracting; Key** |
| | * | **Management Personnel;** |
| **v.** | * | **Responsiveness; Subcontractor** |
| | * | **Responsibility; 48 C.F.R. § 9.104-4.** |
| **THE UNITED STATES,** | * | |
| | * | |
| **Defendant,** | * | |
| | * | |
| **and** | * | |
| | * | |
| **PERNIX GROUP, INC.,** | * | |
| | * | |
| **and** | * | |
| | * | |
| **FRAMACO INTERNATIONAL, INC.,** | * | |
| | * | |
| **Intervenors.** | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * | | |

Dirk Haire, Alexa Santora, and P. Sean Milani-nia, Fox Rothschild LLP, 1030 15th Street, NW, Suite 380 East, Washington, D.C. 20005, for Plaintiff.

Benjamin Mizer, Robert E. Kirschman, Jr., Deborah Bynum, Jessica R. Toplin, and Jimmy S. McBirney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, P.O. Box 480, Ben Franklin Station, Washington, D.C. 20044, for Defendant.

J. Randolph MacPherson and Rebecca Bailey Jacobsen, Halloran & Sage, LLP, 1717 Pennsylvania Avenue, NW, Suite 675, Washington, D.C. 20006, for Intervenor Pernix Group, Inc.

---

[1]     The Court issued this opinion under seal on October 14, 2016, and directed the parties to file any proposed redactions by October 28, 2016. Following an order to show cause, Intervenor Framaco withdrew several proposed redactions on November 15, 2016. The Court publishes this Opinion indicating redactions by asterisks "[***]."

<u>Jonathan D. Shaffer</u>, Smith Pachter McWhorter PLC, 8000 Towers Crescent Drive, Suite 900, Tysons Corner, VA 22182, for Intervenor Framaco International, Inc.

---

## OPINION AND ORDER

---

**WILLIAMS**, Judge.

This post-award bid protest comes before the Court on the parties' cross-motions for judgment on the Administrative Record ("AR"). Plaintiff, Caddell Construction Company ("Caddell"), challenges the Department of State, Bureau of Overseas Building Operations' ("DOS") award of a contract to Framaco International, Inc. ("Framaco") for the construction of an embassy compound at Port Moresby, Papua New Guinea. Framaco, the awardee, and Pernix Group, Inc. ("Pernix"), another offeror, intervened.[2] DOS voluntarily stayed performance of the contract until August 1, 2016. Plaintiff then sought a preliminary injunction to stay award pending resolution of the protest. On August 19, 2016, the Court orally denied Plaintiff's motion for a preliminary injunction, finding that Plaintiff had not established a likelihood of success on the merits and that the equities and public interest militated against preliminary injunctive relief. Tr. 22 (Aug. 19, 2016).

The procurement was conducted in two phases: a Phase I prequalification, and a Phase II technical and price evaluation of prequalified offerors. This is the fourth decision in this case. In its first opinion, the Court remanded the protest to DOS for further explanation of its decision to prequalify Framaco. <u>Caddell Constr. Co. v. United States</u>, 125 Fed. Cl. 264, 275 (2016). On February 22, 2016, pursuant to the Court's remand order, DOS supplemented the AR with the Contracting Officer's prequalification redetermination containing his rationale for prequalifying Framaco. The Court held a hearing on February 29, 2016, and orally denied Caddell's challenge to DOS' evaluation of Framaco's Phase I prequalification submission. Tr. 58-59 (Feb. 29, 2016); Order (Mar. 1, 2016).

With respect to Phase II of the procurement, Plaintiff challenges DOS' findings that:

1) Framaco's management staffing proposal was responsive to the Solicitation;

2) Framaco's subcontracting proposal was responsive to the Solicitation's limitation on subcontracting clause; and

3) Framaco was responsible.

Plaintiff asks the Court to set aside award to Framaco and award the contract to Caddell. The Court deferred deciding Caddell's Phase II challenges pending the decision of a related matter that

---

[2]    Intervenor Pernix took no position on Caddell's Phase II challenges to DOS' award to Framaco. Therefore, any references to Intervenor in this Opinion are to Framaco.

could have impacted Framaco's and its subcontractor Louis Berger Group, Inc.'s ("Louis Berger") responsibility, <u>Algese 2 s.c.a.r.l. v. United States</u>, 127 Fed. Cl. 497 (2016).

For the reasons stated below, the Court denies the protest.

## <u>Findings of Fact</u>[3]

### <u>Phase I Prequalification</u>

On March 17, 2015, DOS issued a Notice of Solicitation for the construction of an embassy compound at Port Moresby, Papua New Guinea, on a 7.26-acre property.  AR 1.  The project was to consist of new construction, limited demolition, and expansion of some of the existing structures.  <u>Id.</u>  The successful bidder was to incorporate work previously completed and add perimeter security systems, a main compound access pavilion, a service compound access pavilion, a four-story office annex, a Marine Service Guard residence, a service/utility building, an enlarged single story support annex, and a recreation facility.  <u>Id.</u>  The Notice of Solicitation valued the project at $89-$105 million.  <u>Id.</u>

The Notice of Solicitation required prospective offerors to demonstrate that they qualified as "United States Persons" under the Omnibus Diplomatic Security and Antiterrorism Act of 1986, 22 U.S.C. § 4852 (2012) ("Security Act").  AR 12.  Ten offerors completed Phase I submissions.  AR 101.  On July 1, 2015, DOS determined that nine of the 10 potential offerors were eligible to compete for award under Phase II.  AR 145.

### <u>The Solicitation</u>

On July 6, 2015, DOS issued the Solicitation for the Port Moresby Embassy construction project.  AR 147.  Four offerors timely submitted Phase II offers:  Framaco, Caddell, Pernix, and B.L. Harbert, Inc. ("BL Harbert").  The project was to be completed in 30 months.  AR 189.

Award was to be made on a lowest-priced technically acceptable basis.  AR 334.  Section M.2 of the Solicitation governed technical acceptability.  Section M.2.1.1 permitted the Agency to conduct discussions with offerors, and required offerors to comply with the following factors to be deemed technically acceptable:

Factor 1: Constructor Technical Project Experience

Factor 2: Constructor Past Performance

Factor 3: Technical Approach and Risk

Factor 4: Management/Organization

---

[3]    These findings of fact are derived from the AR.  Additional findings of fact are in the Discussion.  The Court does not correct grammatical or typographical errors in quotations from the record.

Subfactor 1: Offeror's Organization for the Project

Subfactor 2: Staffing Approach and Key Resumes

Subfactor 3: Subcontractor Management Program

Factor 5: Safety Program

Factor 6: Recruitment Plan

Factor 7: Housing Plan

AR 328-34.   Factor 4 Management/Organization and its subfactors are at issue in the instant protest.

Factor 4's Subfactor 1, "Offeror's Organization for the Project," required offerors to:

Identify all of the major components of the team for the Project, and explain how their work will be integrated into the overall scope.  Project titles and names used shall match the resumes required elsewhere in this solicitation.

Provide an organizational chart showing the relationship between the Offeror, subcontractors, QC [quality control] personnel, Safety personnel, and [DOS].

AR 331.

Factor 4's Subfactor 2, "Staffing Approach and Key Resumes," required offerors to:

Provide, in table format, a breakdown of all of the Offeror's project management manpower resources, the projects to which they are currently committed, and when those commitments end.  Indicate which of those personnel will be assigned to the Project.  Include verification that all Key Personnel have required clearances.

Id.

Subfactor 2 further required that each offeror provide resumes for the following contractor management positions:

• One Project Manager with 10+ years' experience, a bachelor's degree in architecture or engineering, and a secret level security clearance;

• One Project Engineer with 5+ years' experience, a bachelor's degree in architecture or engineering, and a secret level security clearance;

• One Construction Security Manager with 5+ years' experience and a secret level security clearance;

4

• Two Superintendents each with 5+ years' experience and a secret level security clearance;

• One Quality Control Manager with a secret level security clearance;

• One Project Controls Engineer with a secret level security clearance;

• One Safety Health Project Manager;

• One Warranty Manager with a secret level security clearance; and

• One Professional Nurse.

Id.; AR 279-80.

Division One Specifications Section 011005 provided that each key management position had to be held by a different individual.  AR 279.  Section 011005 further provided that the Contractor "shall depict how management supervisory, and administrative functions shall be performed, to include lines of communication and supervisory responsibility for sub-contractors." AR 280.

Lastly, Factor 4, Subfactor 3, "Subcontractor Management Program," required offerors to:

Describe by name and position all subcontractors identified for the Project and how the Offeror plans to integrate those subcontractors into the overall contract effort.

Describe plans for implementing and maintaining surveillance over subcontractors to ensure performance is consistent with contract requirements.  The Subcontractor Management Program should be detailed and specific to the Project and site conditions and provide an overview of corporate management philosophy.

*          *          *

With respect to a diplomatic construction project, a prime contractor may not subcontract more than 50 percent of the total value of the project.

AR 331-32 (emphasis added).

Section L.23.2.1.6 of the Solicitation required offerors to submit a "Small Business Subcontracting Plan," stating:

If the offeror is a large business, a subcontracting plan for Small Business and Small Disadvantaged Business concerns shall be submitted in this volume in accordance with FAR Clause 52.219-9.

AR 326.  FAR 52.219-9 states that the offeror was required to provide "[g]oals, expressed in terms of percentages of total planned subcontracting dollars," that would be allocated to different types of small business concerns as subcontractors, as well as "[t]otal dollars planned to be subcontracted for an individual contract plan."  48 C.F.R. §§ 52.219-9(d)(1), (d)(2)(i) (2016).

5

**Framaco's Initial Technical Proposal**

Framaco timely submitted its initial technical proposal on September 15, 2015.  With respect to project management and staffing, Section L, paragraph L.23.2.2.6.1.2, required the offeror to:

> Identify all of the major components of the team for the Project, and explain how their work will be integrated into the overall scope.

AR 331.  Sections L.23.2.2.6.2.1 and L.23.2.2.6.2.2 required the offeror to:

> Provide, in table format, a breakdown of all of the Offeror's project management manpower resources, the projects to which they are currently committed, and when those commitments end.  Indicate which of those personnel will be assigned to the Project.  Include verification that all Key Personnel have required clearances.
> […] Identify the extent to which the proposed construction management team has worked together on previous projects.

Id.

In its initial technical proposal, Framaco responded to Section L.23.2.2.6.2.1, stating that Framaco's Head Office was "currently located in Rye Brook, NY" and would be "strengthened for the Port Moresby Project," and providing the following tables:

| Framaco Head Office: [***] | | | |
|---|---|---|---|
| **TITLE** | **NAME** | **CURRENT COMMITMENT** | **END OF COM.** |
| President | [***] | [***] | - |
| Program Director | [***] | [***] | - |
| Program Manager | [***] | [***] | - |
| Project Controls (Head Office) | [***] | [***] | - |

| Framaco Project Site Office: [***]: | | | |
|---|---|---|---|
| **TITLE** | **NAME** | **CURRENT COMMITMENT** | **END OF COM.** |
| Project Manager | [***] | [***] | [***] |
| Project Engineer | [***] | [***] | [***] |
| Project Controls Engineer | [***] | [***] | [***] |
| General Superintendent (Later Warranty Manager) | [***] | [***] | [***] |
| Superintendent | [***] | [***] | [***] |
| QC Manager | [***] | [***] | [***] |
| Safety Manager | [***] | [***] | [***] |

| Site Security Manager | [***] | [***] | [***] |
|---|---|---|---|

| Framaco Project Site Office: TCN [4] | | | |
|---|---|---|---|
| **TITLE** | **NAME** | **CURRENT COMMITMENT** | **END OF COM.** |
| Non-CAA [Controlled Access Area] Asst. Project Manager | [***] | [***] | - |
| Non-CAA Site Engineer | [***] | [***] | - |
| Non-CAA Technical Office Manager | [***] | [***] | - |
| Non-CAA Quality Officer | [***] | [***] | - |
| Non-CAA HSE Officer | [***] | [***] | |

AR 492.

Framaco represented:

The Louis Berger Group, Inc. (Louis Berger) will be providing the proposed construction management team for Port Moresby. Framaco and Louis Berger have worked together effectively and harmoniously for 11 years. The proposed construction management staff meets or exceeds all the government requirements for the positions proposed and have worked with either Framaco, Louis Berger or have supported [Department of State Bureau of Overseas Building Operations] in the past. This is a strong team of professionals which will be able to deliver the Port Moresby project. The majority of the personnel have worked for Louis Berger on a successful project in the past, working on either an [Overseas Building Operations] project or other construction project with similar sensitive areas. Louis Berger also brings an extensive experience in Australia where they have 2 regional offices with experience in the construction industry that are aware of this contract and shall support Framaco.

This core team has built a unique understanding of the complexity of dealing with the challenges prevalent in developing countries and truly understands the geopolitical and economic situations that will be in play during this project. They will be an asset to the execution of this project as they will reach out to the network they have established which will certainly support them and help lead to a successful completion of this [New Embassy Compound].

*     *     *

For the non-CAA [Controlled Access Area] work in Port Moresby, Framaco partnered with ZAFER who is among the World's Largest 250 International

---

[4] "TCN" refers to "third country national" subcontractors. AR 217.

> Contractors list selected by ENR (Engineering News Record) Magazine in 2014 (ranked No. 242) and in 2015 (ranked at No. 233).  Over the last 7 years, several Framaco personnel worked with ZAFER on several US Government projects . . . .

AR 493-94.

Section L.23.2.2.6.3.2, which governed the subcontracting requirements, stated that the offeror must:

> Describe by name and position all subcontractors identified for the Project and how the Offeror plans to integrate those subcontractors into the overall contract effort.

AR 331.  In response to these requirements, Framaco listed [***] subcontractors and identified their fields of service.  AR 540.  Framaco did not list Louis Berger as a subcontractor.  Id.  The first subcontractor identified on Framaco's list was Zafer, to work as "[***]."  Id.

Framaco responded to Subfactor 3, Subcontractor Management Program, of Factor 4, Management/Organization, stating:

> L.23.2.2.[6].3.5 Limit for Subcontracting
>
> Framaco, with respect to a diplomatic construction project, confirms that we will not subcontract more than 50% of the total value of the project.

AR 549.   Along with this representation, Framaco submitted a six-page Small Business Subcontracting Plan, as required by the Solicitation and FAR Clause 52.219-9.  AR 370-75. Framaco indicated the percentage of subcontracting dollars that would be allocated to each of six categories of subcontractors, but did not provide either the individual dollar amounts that corresponded to those percentages or the total dollar value of all planned subcontracting.  AR 371.[5]

In addition, Framaco provided its responsibility certification pursuant to FAR Clause 52.209-7, representing that it had entered required information regarding any criminal court or administrative proceeding involving Framaco into the Federal Awardee Performance and Integrity Information System ("FAPIIS").  AR 362-63.  The Solicitation did not require Framaco to provide a similar responsibility certification for its subcontractors.   FAR Part 9.104-4 addresses Subcontractor Responsibility, providing:

> (a) Generally, prospective prime contractors are responsible for determining the responsibility of their prospective subcontractors (but see 9.405 and 9.405-2 regarding debarred, ineligible, or suspended firms).  Determinations of prospective subcontractor responsibility may affect the Government's determination of the prospective prime contractor's responsibility.  A prospective contractor may be required to provide written evidence of a proposed subcontractor's responsibility.

---

[5]     The Small Business Contracting Plan listed six types of small business concerns: Small Business, Small Disadvantaged Business, Woman-Owned Small Business, HUBZone Small Business, Service-Disabled Veteran-Owned Small Business, and Other Than Small Business.  AR 371.

(b)  When it is in the Government's interest to do so, the contracting officer may directly determine a prospective subcontractor's responsibility (e.g., when the prospective contract involves medical supplies, urgent requirements, or substantial subcontracting).  In this case, the same standards used to determine a prime contractor's responsibility shall be used by the Government to determine subcontractor responsibility.

48 C.F.R. § 9.104-4 (2016).

## DOS' Initial Evaluation of Phase II Proposals

On September 25, 2015, the Technical Evaluation Panel ("TEP") memorialized its first evaluation finding that only one offeror, BL Harbert, met proposal requirements.  AR 956.

With respect to Framaco, the TEP issued a "fail" rating on all three Factor 4 "Management/Organization" subfactors – – "Offeror's Organization for the Project," "Staffing Approach and Key Resumes," and "Subcontractor Management Program."  AR 968-69.  The TEP noted:

- "The offeror states that the home office will be strengthened for the project but does not describe how or in what areas. Offeror will only provide home Office management."

- "Site management will be provided by Louis Berger and Zafer. While Zafer is identified as a subcontractor, Louis Berger is not. No clear lines of authority are shown between Framaco and Louis Berger and Zafer."

- "Other than the General Superintendent the Offeror has no Site management personnel. All site management will be provided by Louis Berger Group (LBG) and Zafer (Subcontractor)."

- "While [LBG] will be providing site supervision as stated on page 3/48, no description has been provided of the relationship between the Offeror and LBG."

- "While LBG is providing significant managerial resources to the project, their level of authority is not defined and they do not directly report to the Offeror on site. This almost seems like a Joint Venture project but there is not mention of a JV partnership."

- "QC Mgr: Has no experience as a QC Manager. No NEC [New Embassy Compound] experience."

- "While Zafer is described as a subcontractor, they provide primary management and supervision at the site with no direct supervision by the Offeror.  No description of how Zafer will be managed."

AR 968-69.

With respect to Caddell, the TEP issued a "fail" rating on the same three Factor 4 subfactors, citing concerns about the security clearance of Caddell's proposed quality control manager, Caddell's proposed core management team's availability, and Caddell's organizational chart.  AR 963-64.

The TEP determined that for both Caddell and Framaco, the percent of work subcontracted was [***]%, but the TEP did not describe how it arrived at that number for Framaco.  AR 964, 969.  Louis Berger was not identified as Framaco's subcontractor, indicating that Framaco's named [***] subcontractors would perform [***]% of the work.  Framaco represented that these [***] subcontractors would perform work in non-Controlled Access Area management, labor, technical security systems, telecom works, building automation systems, fire alarm and suppression, electrical testing, construction equipment and civil concrete supplying, "local manpower," accommodations, landscaping, precast piling concrete supplying, precast piling, and security.  AR 540.

The TEP concluded that Framaco, Caddell, and Pernix failed the technical requirements, which prompted the Contracting Officer to request additional information to address the proposals' deficiencies.  The TEP recognized that "[o]nce received, the new information will be reviewed and if the deficiency is adequately addressed, the final evaluation may be revised."  AR 950.

## DOS' Discussions With Offerors

On September 22, 2015, following the first technical evaluation, DOS issued discussion letters to offerors and requested revised proposals by September 25, 2015.  AR 999-1002, 1004. The Contracting Officer requested that Framaco clarify its relationship with its subcontractors, and asked four questions.  First, with respect to Louis Berger, DOS asked:

- Please discuss the relationship between Framaco International and Louis Berger. Louis Berger is not listed in the proposal as a subcontractor to Framaco. What is Louis Berger's level of authority and responsibility?

AR 999.

Framaco responded:

Framaco's "Offeror's Organization for the Project" (L.23.2.2.6.1 Sub factor 1) presents OBO with the individuals <u>within</u> Framaco that will manage the project. As stated in the Factor L.23.2.2.6.2.2 Louis Berger subcontractor services will be related to providing support for some construction management staff that will directly work for Framaco report to Framaco executive Committee.  Louis Berger will not have any level of authority or responsibility on this project.  The Framaco Executive Committee and the Program/Project Management Organization will be the only authority and responsible party handling all "hired subcontractors that will be managed by the Project Manager and his management team on site[."]  The Project manager, the QC Manager and the General Superintendent are all part of Framaco's HR resources.  <u>Framaco amended the Subcontractor Management Program</u> (L.23.2.2.6.3.2 Sub Factor 3).  Separate and apart from the direct hires of

> Framaco, [i]f needed, Louis Berger, is on board to provide Framaco with support for providing additional as necessary qualified and experienced personnel to work on this project for Framaco.  As a separate matter Framaco will retain Louis Berger for engineering, scheduling and consultancy.  However, per Factor 6,[6] any individual working is contractually hired by Framaco reports to the Framaco home office management team.

AR 1006 (first emphasis in original).  Framaco did not clarify what kind of "necessary and qualified experienced personnel" or "engineering, scheduling, and consultancy" services Louis Berger would be providing "separate and apart" from Louis Berger's subcontracting services.  Id.

> Second, with respect to Zafer, DOS asked:
> - While Zafer is described as a subcontractor, they provide primary management and supervision at the site with no direct supervision by the Offeror.  No description of how Zafer will be managed

AR 999.

> Framaco responded:
>
> As stated in Factor L.23.2.2.6.2.2. ZAFER subcontractor services will be related to providing construction services for Non CAA portion of the project and they will report to Framaco Project Manager and our construction team at the site.  The organization chart L.23.2.2.6.1.3 provided the flow down from Framaco's Executive Committee to the Project Manager at the site followed by the Framaco Project Office United States cleared personnel to the subcontractors under which the ZAFER teams [sic] falls.

AR 1006 (emphasis in original).  Framaco's Project Manager was listed as Louis Berger employee [***] both in Framaco's initial and revised key management table.

> Framaco's organizational chart was revised between its initial and revised proposals to replace [***] on the Project Executive Committee with [***] - - who was listed as Framaco's Program Director in both its initial and revised proposals.  Compare AR 489 with AR 1054.  This was the only change between Framaco's initial and revised organization chart.  Id.

> Third, the Contracting Officer asked about Framaco's home office, stating:
>
> - Offeror states home office will be strengthened for the project but does not describe how or in what areas.

AR 999.

---

[6]     Framaco's reference to Factor 6 appears to be a typographical error.  Factor 6, "TCN National Recruitment Plan," governed the Contractor's use of recruiters in hiring third-country nationals to work on DOS contracts.

Framaco responded:

Upon award of every new contracts Framaco's procedure is the formation of a dedicated project team at our New York HQ offices that will focus on running the project. As required, and subject to the size of the project, this is the process we establish to supplement our core team staffing requirements accordingly. In the case of Port Moresby, our Division 1, includes the following additional positions that will be specifically added to our existing team: Project Coordinator, Procurement / Supply Chain specialist and one more HR administrative coordinator. These individuals will be reporting back to the Program Manager.

AR 1007.

Lastly, the Contracting Officer questioned Framaco's apparent lack of site management personnel and reliance on Louis Berger and Zafer, stating:

- Other than the General Superintendent, the Offeror has no Site management personnel. All site management will be provided by Louis Berger and Zafer.

AR 999.

Framaco responded:

All the individuals Framaco provide the [Government] are detailed in the Staffing Plan (Factor 4) of our proposal. Each time we are awarded a project we comply with Section 23.2.2.6 Factor 4 "Management/Organization[."] We implement this plan and general always end up exceeding these commitments in comparison to the information we provide the US Government in the Factor 4 of our proposal.

AR 1008.

Framaco's original staffing plan included both the chart that listed Louis Berger as the "Current Commitment" for [***] out of [***] employees and these employees' resumes. Framaco updated this staffing chart to change the Current Commitment for [***] of its [***] listed site personnel - - [***] - - to other designations:[7]

---

[7]     This update occurred within 10 days after Framaco's original proposal and was consistent with Framaco's submitted resumes for these employees in Framaco's original proposal. Compare AR 1057 with AR 491 and AR 504-28 (Site Office Resumes). The "end of commitment dates" in Framaco's revised proposal for these employees were also consistent with Framaco's initial proposal except for [***] individuals: [***], who changed [***] commitment from "[***]" to "[***]" and [***] who changed [***] commitment from "[***]" to "[***]." Compare AR 1057 with AR 491.

| Framaco Project Site Office: US Personnel: | | | | |
|---|---|---|---|---|
| TITLE | NAME | Clearance | CURRENT COMMITMENT | END OF COM. |
| Project Manager | [***] | [***] | [***] | [***] |
| Project Engineer | [***] | [***] | [***] | [***] |
| Project Controls Engineer | [***] | [***] | [***] | [***] |
| General Superintendent | [***] | | [***] | [***] |
| Superintendent | [***] | [***] | [***] | [***] |
| QC Manager | [***] | [***] | [***] | [***] |
| Safety Manager | [***] | [***] | [***] | [***] |
| Site Security Manager | [***] | [***] | [***] | [***] |

AR 1057.[8]  Although Framaco changed the "current commitments" of the proposed personnel, none of the listed individuals themselves changed, and Framaco continued to list as "current commitments" the companies that employed these personnel rather than the projects on which they worked.  Id.  The current project details for these employees were listed on the employee resumes provided to DOS.

The Contracting Officer requested that Caddell clarify the availability of its personnel, confirm whether its quality control manager had a secret clearance, and explain its relationship to another company mentioned in its technical proposal.  AR 1001.  In its revised proposal, Caddell explained that all personnel would be available to work if Caddell were awarded the contract and that its quality control manager would have his security clearance reactivated.  AR 1166.  In response to the Contracting Officer's discussion question, Caddell also clarified its relationship with Enka, stating:

> Caddell's proposal does not identify Enka as a "primary subcontractor."  As stated in the Proposal Overview, Caddell proposes to use the resources of Enka Construction as a primary consultant to provide manpower and material resources to the Port Moresby [New Embassy Compound] project.  Caddell has benefited from Enka's resources and worldwide construction experience on [***] current and completed diplomatic projects to date.

AR 1167; see AR 944.

**DOS' Second Technical Evaluation**

On September 28, 2015, the TEP issued its second technical evaluation.  AR 1175.  Instead of drafting a new document, the TEP reissued its first evaluation, crossing out its previous

---

[8]      Except for [***], Framaco's [***], Framaco's revised management chart was consistent with all management personnel's resumes in Framaco's initial technical proposal - - [***] initial resume, but this was remedied in [***] revised resume by listing [***] as [***] current commitment.  Compare AR 507 with AR 1062.

questions and adding new notations underneath the stricken-through questions.  AR 1175-95.
Following the offerors' submission of additional information, the TEP determined that all four
offerors - - Framaco, Caddell, Pernix, and B.L. Harbert - - met the Solicitation requirements.  AR
1175.

With respect to Framaco, the TEP changed Framaco's grade from "fail" to "pass" on the
three Factor 4 subfactors - - "Offeror's Organization for the Project," "Staffing Approach and Key
Resumes," and "Subcontractor Management Program."  AR 1186-88.  With regard to Framaco's
relationship with Louis Berger, the TEP stated: "[o]fferor clarified the roles of Louis Berger on
the project per additional information dated 09/25/2015."  AR 1186.  This was the TEP's sole
comment on Framaco's revisions regarding the proposed role of Louis Berger.  With regard to
Zafer, the TEP noted, "Zafer would report to the on-site project management team per additional
information dated 09/25/2015."  AR 1188.

With regard to strengthening Framaco's home office, the TEP noted, "[o]fferor would add
new domestic positions for . . . home office support project team per additional information dated
09/25/2015."  AR 1186.  Finally, with regard to site management personnel, the TEP noted, "[t]he
panel assumed that site management, provided by Louis Berger, would be contractually employed
by the Offeror and compensation would be directly through Offeror's HR department, not through
Louis Berger."  AR 1187.  There was nothing in Framaco's proposal about subcontracting [***]%
of the work, rather, Framaco maintained in its initial and revised proposals that it would
subcontract less than 50% of the work, and then later in its subcontracting plan a definitive [***]%
of the work.  AR 549, 1021, 1215.54.

On September 29, 2015, the Contracting Officer and Contracting Specialist signed a Price
Negotiation Memorandum, finding Framaco to be the lowest-priced, technically acceptable
offeror.  AR 1214-15. The same day, the Contracting Specialist sent Framaco's subcontracting
plan to DOS' Office of Small and Disadvantaged Business Utilization for review.  AR 1215.1-.2.
The Office of Small and Disadvantaged Business Utilization initially rejected Framaco's small
business subcontracting plan because Framaco did not indicate the amount in dollars that would
be allocated to each type of small or disadvantaged business, but rather only indicated the
percentage of subcontracting dollars that would be allocated to each type of small or disadvantaged
business.  In response, Framaco submitted a revised subcontracting plan, allocating individual
dollar amounts to each of the six types of subcontractors in addition to the percentages - - which
remained constant - -  as follows:

| Subcontractor Type | Estimated Dollar Value | Percentage of Planned Subcontracting |
|---|---|---|
| Small Business | [***] | [***] |
| Small Disadvantaged Business | [***] | [***] |
| Woman-Owned Small Business | [***] | [***] |
| HUBZone Small Business | [***] | [***] |

| Service-Disabled Veteran-Owned Small Business | [***] | [***] |
|---|---|---|
| "Other" Than Small Business | [***] | [***] |

AR 1215.54.

In its subcontracting plan and revision, Framaco did not list the individual subcontractor entities that would fall into each "subcontractor type." AR 1215.5, 1215.54. Framaco represented that it would comply with the reporting and recordkeeping requirements of the small business entities it would employ during contract performance and would "notify both the cognizant Contracting Officer and the Office of Small and Disadvantage Business Utilization, U.S. Department of State of its submissions." AR 1215.58. After Framaco's revision, DOS' Office of Small and Disadvantaged Business Utilization approved Framaco's subcontracting plan. AR 1215.64. Framaco indicated in its subcontract plan that it would subcontract an estimated [***] million of work, or approximately [***]% of the total value of the project. AR 1215.54. Framaco's final bid in its revised proposal was $95,875,381. AR 1085.

### DOS' Initial Responsibility Determination and Award Decision

On September 29, 2015, after Framaco's subcontracting plan was approved, DOS issued its initial two-page responsibility determination, finding that Framaco's proposal was technically acceptable and was rated "Excellent," and that Framaco met all requirements for a "United States person" required by the Security Act. AR 1216-17. In this responsibility determination, DOS also concluded that the Dun & Bradstreet report dated September 19, 2015, indicated that Framaco was "Low Risk with a clear financial history" and in "'Fair' Financial Condition." AR 1217. Finally, the Contracting Officer noted that "Framaco is not listed on the Excluded Parties List from Federal Procurement and Non-Procurement Programs dated on September 19, 2015." Id. In conclusion, the Contracting Officer found Framaco responsible. Id. There is no evidence in the record that the Contracting Officer performed a review of Framaco's subcontractors' responsibility.

On September 30, 2015, the Contracting Officer notified the four Phase II offerors that Framaco had been selected for award. AR 1218-20. There is no document in the AR titled "Source Selection Decision Memorandum" or other document memorializing the rationale for the Contracting Officer's source selection decision.

### Procedural History

On August 21, 2015, Caddell filed this lawsuit, challenging the pre-qualification of Framaco and Pernix. Compl. 1. At the parties' request, this case was stayed from August 24, 2015, through September 25, 2015, to await the outcome of a related case, Caddell Construction Co. v. United States, 123 Fed. Cl. 469 (2015). See Order Lifting Stay (Sept. 25, 2015).[9]

---

[9]      Caddell previously challenged award of an embassy contract in Maputo, Mozambique to Pernix in Caddell Constr. Co. v. United States, 125 Fed. Cl. 30 (2016). The Court denied Caddell's grounds of protest challenging DOS' interpretation of Pernix's total business volume and similar

On October 6, 2015, Plaintiff filed an amended complaint, challenging DOS' prequalification of Framaco in Phase I and award to Framaco in Phase II, but omitting any protest regarding Pernix. Am. Compl. 1.[10]  On October 9, 2015, Defendant filed a notice informing this Court that DOS intended to "take corrective action in this matter by reevaluating the technical proposals of Framaco International, Inc. and Caddell Construction Co. and making a new award consistent with the terms of the solicitation."  Def.'s Not. of Intent to Take Corrective Action 1 (Oct. 9, 2015).

## DOS' Corrective Action

On October 13, 2015, the TEP conducted its third evaluation, consisting of a review of the original proposals and the additional information submitted on September 22, 2015.  AR 1243. On October 15, 2015, the TEP confirmed that all four offerors met the proposal requirements.  AR 1228.

On October 21, 2015, however, the TEP met again to conduct a fourth and final "Amended Technical Evaluation," to specifically address "the qualifications of key personnel[.]"  AR 1245, 1252.  The TEP determined that two of Caddell's proposed key personnel and one of Framaco's key personnel did not have sufficient experience to satisfy the proposal requirements.  AR 1247-48, 1250-51.  On October 23, 2015, DOS reopened discussions to allow Framaco and Caddell to submit final proposal revisions to correct their key personnel deficiencies.  AR 1254-55.  On November 9, 2015, following receipt of Framaco's and Caddell's proposal amendments and clarifications, the TEP determined that both Caddell and Framaco met the Solicitation requirements.  AR 1285.

On November 17, 2015, DOS updated its responsibility determination for Framaco and provided further details regarding Framaco's financial capacity, stating:

> They have adequate financial resources to perform the contract, or the ability to obtain them (see 9.104-3(a)): Framaco International, Inc. has an established and long-standing Bonding history with [***] who presently provide a surety facility for Framaco International, Inc. whom they consider to be among their most valued surety clients.  [***] is prepared to provide Framaco suretyship covering a project and bond in an amount up to [***].

> The Duns & Bradstreet report dated September 19, 2015 indicates that Framaco is Low Risk with a clear financial history and is in "Fair" Financial Condition. Framaco's Credit Appraisal score is a 2 which is considered "Good".  The Financial Stress Class of 4 for this company shows that firms with this class had a failure rate of 0.84% (84 per 10,000).

---

work requirements, but granted Caddell's protest ground challenging DOS' price discussions with Pernix, and permanently enjoined Pernix from performing the contract.  Id. at 34, 56-57.

[10]     In its original complaint, Caddell alleged that DOS should not have prequalified Pernix in Phase I because Pernix did not meet the Security Act's total business volume and similar work requirements.  See Compl. ¶¶ 43-52.

AR 1300.

## Award

On November 20, 2015, DOS re-awarded the contract to Framaco at a price of $95,875,381. AR 1085, 1304. Framaco's subcontracting plan showed a total subcontracting dollar value of [***] million. AR 1215.54. Caddell remained the next lowest-priced technically acceptable offeror eligible for award. AR 1213.

## Court Proceedings Following Corrective Action

On December 3, 2015, following DOS' re-award to Framaco, the parties notified the Court that the corrective action had not resolved two of Caddell's protest grounds - - that Framaco did not qualify as a United States person under the Security Act and that Framaco's proposal was technically unacceptable. Joint Status Rep. (Dec. 3, 2015). As such, Caddell continued to seek declaratory and injunctive relief. Pl.'s Mot. at 36.

On February 10, 2016, the Court orally ruled that DOS failed to supply a reasonable basis for finding Framaco properly prequalified under the Security Act's requirement that an offeror have "existing technical resources sufficient to perform the contract." See Caddell Constr. Co. v. United States, 125 Fed. Cl. 264, 267, 275 (2016). The Court found that the Contracting Officer failed to document how Framaco's [***] home office employees were sufficient under the Security Act and remanded the matter to DOS to reevaluate and document Framaco's compliance with the Security Act's requirements for technical resources. Id. at 275.

On February 18, 2016, the Contracting Officer conducted a prequalification redetermination pursuant to the Court's Remand Order. AR 1971. In his prequalification redetermination memorandum, the Contracting Officer stated:

> Based on my recent experience with Framaco's successful contract completion of the design-build project for construction of the Belgrade, Serbia New Embassy Compound, I believe that Framaco has the ability to mobilize technical resources in the United States sufficient to successfully perform the contract within the project's estimated timeframe and budget. Their [***] fulltime U.S. citizen employees have a proven ability to ramp-up for large-scale construction by hiring additional back office and frontline staff as needed. Currently, Framaco's U.S. technical resources are not overcommitted. I am also the contracting officer for Framaco's only currently active United States government contract, requiring the design and construction of renovations and upgrades to the unclassified temporary personnel camps in Camp Sullivan and Camp Alvarado, Afghanistan; these projects are nearing completion, which will further enhance Framaco's ability to focus its technical resources on the Port Moresby NEC project.

Id.

On February 29, 2016, the Court conducted an oral argument on DOS' Phase I redetermination decision. Plaintiff argued that it was unreasonable for the Contracting Officer to rely on the Belgrade project to prequalify Framaco because the interim Performance Assessment Reports from that project reflected that Framaco had [***] (i.e. its staff and subcontractors), in

particular its mechanical subcontractor. AR 979.[11]  However, the Contracting Officer ultimately gave Framaco an overall rating of "satisfactory" on the Belgrade project, which was similar in size, scope, and complexity to the Port Moresby project at issue in this case. AR 410-11, 983.  The Contracting Officer further recognized that DOS would have another opportunity to evaluate Framaco's proposed management and subcontracting in Phase II and could make a determination based upon Framaco's full proposal at that time.  See AR 540.  The Court found that it was reasonable for the Contracting Officer to prequalify Framaco for the Port Moresby Project, and granted in part Defendant's motion for judgment on the AR, upholding DOS' prequalification of Framaco. Order 1 (Mar. 3, 2016).

## The Court of Federal Claims' March 14, 2016 and July 29, 2016 Decisions in Algese I and Algese II

During the course of this protest, the Court of Federal Claims issued an opinion in Algese 2 s.c.a.r.l. v. United States, holding that the Department of the Navy erred in finding Louis Berger Aircraft Services to be responsible because Louis Berger Aircraft Services - - a sister corporation of Louis Berger Group - - failed to disclose that its parent corporation's principals were "presently indicted for, or otherwise criminally or civilly charged . . . with commission of fraud or other specified bribery and public integrity offenses." 125 Fed. Cl. 431, 441 (2016) ("Algese I") (internal quotation marks omitted).  The bribery and fraud investigations and prosecution referenced in the Algese I decision involved Louis Berger Group - - Framaco's subcontractor in the instant procurement. Id. at 435-37.  The Algese I Court found that Louis Berger Aircraft Services "materially misrepresented" its parent corporation's and principals' past history in its responsibility certifications to the Department of the Navy and was ineligible for award. Id. at 440-44.

The Court in Algese I later vacated its judgment and remanded the matter to the Navy, ordering the Navy to "make an updated responsibility determination and consider issuing a new business clearance memorandum regarding Louis Berger Aircraft Services." Order 2, Algese 2 s.c.a.r.l. v. United States, No. 15-1279C (Fed. Cl. Mar. 29, 2016).  The permanent injunction remained in place during this remand period.

On March 17, 2016, this Court ordered supplemental briefing on the effect of Algese I on the instant protest. Order (Mar. 17, 2016); see Order (June 1, 2016).  On June 3, 2016, Defendant filed a declaration from Contracting Officer David Vivian, stating:

> On March 18, 2016, I was notified that the court had ordered supplemental briefing to address whether and how the court's decision in Algese 2 s.c.a.r.l. v. United States, No. 15-1279C (Fed. Cl. Mar. 4, 2016) impacted the Port Moresby award to Framaco International, Inc. ("Framaco").  I was provided copies of the Algese 2 decision and the court's Order.  I also conducted a search of the System for Award Management and found no records indicating any current or past exclusions for Louis Berger or its affiliated companies.  I was unaware of any allegations against Louis Berger prior to March 18, 2016.

---

[11]     Framaco's mechanical subcontractor for the Belgrade project is not identified in the record.

> After reviewing the decision, I determined that <u>Algese 2</u> did not warrant conducting a new responsibility determination for Framaco because nothing in that case brought any of Framaco's required representations or certifications into question, nor did it cause me to doubt Framaco's business integrity.
>
> I further determined that no responsibility determination was necessary for Louis Berger because the solicitation did not require a responsibility determination for a proposed subcontractor, Louis Berger was not subject to a suspension or debarment, and <u>Algese 2</u> made it clear that Louis Berger had taken steps to avoid future incidents of fraudulent conduct.

Vivian Decl. ¶¶ 4-6 (June 2, 2016).

On June 1, 2016, the Navy submitted a notice to the <u>Algese</u> Court that it had completed a new responsibility determination, again finding Louis Berger Aircraft Services to be responsible. Status Report, <u>Algese 2 s.c.a.r.l. v. United States</u>, No. 15-1279 (Fed. Cl. June 1, 2016). The <u>Algese</u> Court then reviewed the Navy's new responsibility determination. <u>Algese 2 s.c.a.r.l. v. United States</u>, 127 Fed. Cl. 497 (2016) ("<u>Algese II</u>"). After developing a more robust record, the Navy concluded that Louis Berger Aircraft Services had not misrepresented itself in its responsibility certifications. First, the Navy found that the former Chief Executive Officer of Louis Berger Aircraft Services' parent corporation Berger Group Holdings, Inc. lacked an ownership interest in both Louis Berger Aircraft Services and Berger Group Holdings, Inc. and was not a principal as defined in FAR 52.209-7. As such, the Navy concluded that Louis Berger Aircraft Services did not require a responsibility certification disclosing the parent corporation's principal's history of public corruption. <u>Id.</u> at 501-03. The Navy further determined that the parent corporation, Berger Group Holdings, Inc., was not covered by FAR 52.209-5's requirement that the offeror submit a certification reporting a company's past criminal conduct. <u>Id.</u> at 503-05.[12] The Navy supported

---

[12]     FAR 52.209-5 entitled Certification Regarding Responsibility Matters, provides in pertinent part:

> (a)(1) The Offeror certifies, to the best of its knowledge and belief that –
>
> (i) The Offeror and/or any of its Principals –
>
> (A) Are ( ) are not ( ) presently debarred, suspended, proposed for debarment, or declared ineligible for the award of contracts by any Federal agency;
>
> (B) Have ( ) have not ( ) within a three-year period preceding this offer been convicted of or had a civil judgment rendered against them for: commission of fraud of a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State, or local) contract or subcontract; violation of Federal or State antitrust statutes relating to the submission of offers; of commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, tax evasion, violating Federal criminal tax laws, or receiving stolen property (if the offeror checks "have", the offeror shall also see 52.209-7, if included in this solicitation);

its new factual findings with 2,500 pages of information not previously considered, including a declaration from an Assistant U.S. Attorney involved with the prosecutions against the various Louis Berger principals and the affiliate entity, Louis Berger International. Id. at 503-04. In Algese II, the Court recognized that another Louis Berger entity - - Louis Berger International - - was created to "assume[] all liability for" any criminal conduct by Louis Berger Group or its principals. Id. at 504.

Based on extensive new information regarding Louis Berger, the Algese II Court held that the Navy's affirmative responsibility determination for Louis Berger Aircraft Services was reasonable. The Algese II Court reasoned that although it "disagree[d] with the ultimate award determination," the Navy had marshalled sufficient facts, considered by the contracting officer, demonstrating that Louis Berger Aircraft Services had not misrepresented its corporate history of public corruption in its responsibility certifications. Id. at 505. The Algese II court thus upheld the Navy's award to Louis Berger Aircraft Services. Id.

## Discussion

## Jurisdiction and Standard of Review

This Court has jurisdiction over bid protest actions pursuant to 28 U.S.C. § 1491(b). The Court evaluates bid protests under the Administrative Procedure Act's standard of review. Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). Under this standard, the Court will not set aside an agency's procurement decision, unless the agency abused its discretion or acted arbitrarily, capriciously, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (2012); Adams & Assocs., Inc. v. United States, 741 F.3d 102, 105-06 (Fed. Cir. 2014); Ala. Aircraft Indus., Inc. - Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009). The Court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974). If this Court finds that the agency's actions were contrary to law or regulation, the plaintiff must also show that the violation was prejudicial in order to obtain relief. Bannum, 404 F.3d at 1351; Caddell Constr. Co. v. United States, 125 Fed. Cl. 31, 51 (2016). A plaintiff must show prejudice by demonstrating "that there was a substantial chance it would have received the contract award but for [the agency's] error." Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (internal citation omitted).

---

(C) Are ( ) are not ( ) presently indicted for, or otherwise criminally or civilly charged by a governmental entity with, commission of any of the offenses enumerated in subdivision (a)(1)(i)(B) of this provision; and

\*       \*       \*

(2) Principal, for the purposes of this certification, means an officer, director, owner, partner, or a person having primary management or supervisory responsibilities within a business entity (e.g., general manager, plant manager, head of a division or business segment; and similar positions).

48 C.F.R. § 52.209-5(a)(1)-(2).

Under Rule 52.1 of the Rules of the Court of Federal Claims, the parties are limited to the AR, and the Court makes findings of fact as if it were conducting a trial on a paper record.  See Bannum, 404 F.3d at 1354.  Looking to the AR, the Court must determine whether a protester has met its burden of proof based on the evidence in the record.  Id. at 1355 (internal citations omitted).

## DOS' Evaluation of Framaco's Phase II Proposal

Caddell claims that DOS erred in its evaluation of Framaco's Phase II proposal, rendering its decision to award the contract to Framaco arbitrary and capricious.  Specifically, Caddell challenges DOS' determinations that Framaco's key management staffing proposal and subcontracting proposal were technically acceptable.

### Framaco's Key Management Staffing Plan

In challenging Framaco's staffing, Caddell contends that the TEP failed to: 1) consider the internal contradictions in Framaco's original and revised proposals with respect to Louis Berger's role as a subcontractor, 2) rationally ascertain how Framaco's proposed onsite management team would be managed and paid, 3) explain how Framaco's proposed increase from [***] to [***] home office employees would establish adequate home office management, and 4) take into account Framaco's failure to identify current project-level commitments of its proposed onsite management personnel.  Pl.'s Mot. 31.  Caddell argues that in light of these TEP missteps, DOS' award to Framaco was unreasonable.  The Court addresses each of Caddell's arguments in turn.

### DOS Reasonably Accepted Framaco's Clarification of Louis Berger's Role as a Subcontractor

Caddell argues that DOS unreasonably accepted Framaco's internally inconsistent management proposal because Framaco listed Louis Berger as its "proposed construction management team" and not as a subcontractor in its initial proposal, and later listed Louis Berger as a subcontractor in its revised proposal with "no responsibility or authority on the project."  Pl.'s Mot. 30; compare AR 493, 540 with AR 1012.  Framaco argues that its revised proposal was clear and consistent and represented that Louis Berger would be providing subcontracting services to provide "support for some construction management staff."  Framaco Mot. 39; see AR 1006.

The question and answer that gave rise to this ground of protest are as follows.  The Contracting Officer asked Framaco:

> Please discuss the relationship between Framaco International and Louis Berger.  Louis Berger is not listed in the proposal as a subcontractor to Framaco.  What is Louis Berger's level of authority and responsibility?

AR 999.  Framaco responded:

> Framaco's "Offeror's Organization for the Project" (L.23.2.2.6.1 Sub factor 1) presents [DOS] with the individuals within Framaco that will manage the project.  As stated in the Factor L.23.2.2.6.2.2 Louis Berger subcontractor services will be related to providing support for some construction management staff that will directly work for Framaco report to Framaco executive Committee.  Louis Berger will not have any level of authority or responsibility on this project.  The Framaco

Executive Committee and the Program/Project Management Organization will be the only authority and responsible party handling all "hired subcontractors that will be managed by the Project Manager and his management team on site[."]  The Project manager, the QC Manager and the General Superintendent are all part of Framaco's HR resources.  Framaco amended the Subcontractor Management Program (L.23.2.2.6.3.2 Sub Factor 3).  Separate and apart from the direct hires of Framaco, [i]f needed, Louis Berger, is on board to provide Framaco with <u>support</u> for providing additional as necessary qualified and experienced <u>personnel</u> to work on this project for Framaco.  As a separate matter Framaco will retain Louis Berger for engineering, scheduling and consultancy.  However, per Factor 6, any individual working is contractually hired by Framaco reports to the Framaco home office management team.

AR 1006 (emphasis in original).

In essence, the Agency invited Framaco to explain Louis Berger's relationship with Framaco and clarify whether Louis Berger would be a subcontractor.  Framaco provided both the explanation and the clarification.  Framaco represented that Louis Berger would be a subcontractor, but would not have authority over, or responsibility for, contract management.  <u>Id.</u> Framaco clarified that Framaco itself would manage the project, specified that its proposed Project Manager, Quality Control Manager, and General Superintendent would be Framaco employees, and candidly acknowledged that Framaco would be hiring individuals away from Louis Berger - - who would become Framaco's direct employees, not subcontractors.  <u>Id.</u>  The Solicitation did not prohibit such a proposal revision.  While Framaco responded by radically changing what it had represented initially, this was not a violation of law, regulation, or the Solicitation's terms, and Framaco was bound to perform in accordance with its revised proposal.  <u>See</u> 48 C.F.R. § 15.306(d) (2014) (providing that an Agency's discussions with an offeror "are undertaken with the intent of allowing the offeror to revise its proposal").  DOS acted rationally in finding Framaco's answer that "Louis Berger will not have any level of authority or responsibility on this project" to be responsive to its concerns.  AR 1006.

Caddell questions "how Louis Berger could be 'providing the proposed construction management team' but also have no responsibility on the project."  Pl.'s Mot. 30.  Framaco answered this question by representing that Framaco, not Louis Berger, would be providing construction management.  The fact that Framaco would be hiring its construction managers from Louis Berger was fully disclosed, and the Agency understood and accepted Framaco's representation that these managers would be on Framaco's payroll and would be "all part of Framaco's HR resources." AR 1006.  While Caddell suggests that this arrangement appeared dubious, the Agency permissibly considered Framaco's representations to be a firm commitment. Simply put, Framaco is bound to provide on-site construction management using its own employees - - [***], Project Manager, [***], Project Engineer, [***], Project Controls Engineer, [***], General Superintendent, [***], Superintendent, [***], QC Manager, [***], Safety Manager, and [***], Site Security Manager.  AR 1057.  Framaco is also bound to use its subcontractor Louis Berger for on-site support, not management.  <u>See</u> AR 1006.

Permitting an offeror to substantially change its proposal following discussions may be risky, but it is not illegal.  FAR Part 15.307 entitled "Proposal Revisions," does not limit the extent of proposal revisions but provides:

> The contracting officer may request or allow proposal revisions to clarify and document understandings reached during negotiations.  At the conclusion of discussions, each offeror still in the competitive range shall be given an opportunity to submit a final proposal revision.  Requests for final proposal revisions shall advise offerors that the final proposal revisions shall be in writing and that the Government intends to make award without obtaining further revisions.

48 C.F.R. § 15.307(b) (2016).  As explained by Professors Nash, Cibinic, and Yukins:

> If the negotiations have been carried to the point of agreement with each offeror in the competitive range, the agency may expect the final proposal revisions to reflect that agreement.  However, under FAR 15.307(b), offerors can submit a final offer that varies from such agreement in any way that they desire.  Final offers that vary substantially from the prior agreement can lead to difficulties in the procurement process because they require the agency to expend resources in evaluating the new offer and create the risk of misunderstandings between the parties.  In some cases they have led to the need for additional negotiations and a new set of final proposals.

John Cibinic, Jr., Ralph C. Nash, Jr., & Christopher R. Yukins, Formation of Government Contracts 927 (4th ed. 2011).  Here, there was no "prior agreement" about what Framaco versus Louis Berger was to provide, and in response to the Agency's questions, Framaco radically changed its initial proposal regarding which entity was employing its proposed onsite personnel and what Framaco, as opposed to Louis Berger, was committed to do.  The Agency acknowledged and accepted the altered proposal, and Framaco is bound to honor that revised proposal.  Any inconsistencies between Framaco's revised proposal and initial proposal are of no moment here.

### DOS Acted Reasonably In Accepting Framaco's On-Site Management Approach

Caddell contends that it was arbitrary and capricious for DOS to approve Framaco's proposed site management team because the "TEP improperly assumed that 'site management, provided by Louis Berger, would be contractually employed by the Offeror [Framaco] and compensation would be directly through Offeror's HR department, not through Louis Berger.'" Pl.'s Mot. 31 (quoting AR 1187) (alteration in original).  The TEP's wording is not a model of clarity, but taken as a whole, indicates that Defendant reasonably determined that Framaco - - not Louis Berger - - would directly employ construction site management.  The language of Framaco's answer supports DOS' conclusion.

In discussions, DOS stated:

> Other than the General Superintendent, the Offeror has no Site management personnel. All site management personnel will be provided by Louis Berger and ZAFER.

AR 1008.  Framaco responded:

> This statement is inaccurate as the Site management team is provided by Framaco. All the individuals Framaco provide the [United States Government] are detailed in the Staffing Plan (Factor 4) of our proposal.

Id.  In sum, DOS reasonably accepted Framaco's unambiguous statement that Framaco would be providing the on-site management personnel, and that the on-site management personnel would not be working for Louis Berger, but were employees "within Framaco."  AR 1006, 1008-09.

## DOS Rationally Accepted Framaco's Home Office Staffing Approach

Caddell asserts that DOS acted irrationally in accepting Framaco's home office staffing approach because it failed to document how "a home office of [***] employees could support a $95 million project from afar, when only [***] is directly employed by Framaco . . . ."  Pl.'s Mot. 30-31.  As Defendant and Framaco point out, the Solicitation contained no minimum home office staffing requirement, and Framaco's proposal was clear that Framaco's home office and management was in New York.  Def.'s Mot. 15; Framaco's Mot. 30, 33.  DOS was aware that Framaco had performed prior contracts using its New York home office management team, including the construction of a new embassy compound in Belgrade, Serbia, where Framaco's final performance was rated satisfactory.  AR 983.

The Solicitation specified particular management positions that had to be performed by on-site staff - - Project Manager, Project Engineer, Construction Security Manager, Superintendents (two persons),  Quality Control Manager, Project Controls Engineer, Safety Health Project Manager, Warranty Manager, and Professional Nurse.  There was no similar requirement calling out either the number or type of positions required in the home office.

DOS, through its technical evaluation, identified a potential weakness in Framaco's home office staffing and appropriately addressed that concern through discussions.  AR 968, 999, 1007, 1186.  In its initial proposal Framaco stated that its home office "will be strengthened for the Port Moresby Project" and "will provide full support to the site."  AR 484.  The TEP, in its first evaluation, found these statements to be "weaknesses" and stated:

> The offeror states that the home office will be strengthened for the project but does not describe how or in what areas.  Offeror will only provide home Office management.

AR 968.

The Contracting Officer raised this concern to Framaco in a discussion letter, asking Framaco to "describe how or in what areas" its home office would be strengthened for the project. AR 1007.  Framaco responded:

> Upon award of . . . new contracts Framaco's procedure is the formation of a dedicated project team at our New York HQ offices that will focus on running the project.  As required, and subject to the size of the project, this is the process we establish to supplement our core team staffing requirements accordingly.  In the

case of Port Moresby, our Division 1, includes the following additional positions that will be specifically be added to our existing team: Project Coordinator, Procurement / Supply Chain specialist and one more HR administrative coordinator. These individuals will be reporting back to the Program Manager. For your information, for the past 26 years, Framaco has become a leader in Logistics of exporting US manufactured construction material; we are constantly hiring employees and will use our HR Dept. to support any needs required for the successful execution of the Port Moresby project.

Id.

After reviewing Framaco's response, the TEP changed Framaco's rating from fail to pass, and noted that Framaco would add new domestic positions for its "home office support project team per additional information dated 09/25/2015."   AR 1186; see also AR 432, 982-85 (documenting Framaco's performance of the Belgrade project, including its staffing approaches, which resulted in an overall satisfactory final rating).   Based upon the totality of information Framaco provided, DOS rationally found Framaco's home office staffing acceptable. AR 1186.

### Minor Errors in DOS' Evaluation of Framaco's Key Management Personnel Project Commitments were Immaterial

Caddell argues that DOS violated Section L.23.2.2.6.2 of the Solicitation - - requiring lists of management personnel's current project commitments - - because Framaco's revised proposal listed current commitments to companies, not projects. Defendant admits that "neither Framaco's initial or revised technical proposals comply with the literal terms of the solicitation," but argues that these discrepancies were de minimis, did not affect DOS' ability to evaluate Framaco's proposal, or "provide a sufficient basis for overturning award." Def.'s Mot. 17-18.

Solicitation Factor 4 Subfactor 2 provision L.23.2.2.6.2 requires offerors to:

Provide, in table format, a breakdown of all of the Offeror's project management manpower resources, the projects to which they are currently committed, and when those commitments end.  Indicate which of those personnel will be assigned to the Project.  Include verification that all Key Personnel have required clearances.[13]

AR 331.  In response to this requirement, Framaco did not provide a list of "projects," but instead listed company commitments of its management personnel in both its initial and revised proposals. AR 491-92, 1057.  For example, Framaco listed Project Manager [***] as currently committed to [***], with the end of his commitment in [***].  AR 1057.

However, Framaco listed the projects on which these key employees worked elsewhere in its proposal.  In addition to the tabular chart, the record contains resumes of the key management

---

[13]     Caddell also challenges whether one of Framaco's key management employees, [***], met the [***] requirement of L.23.2.2.6.2.  Pl.'s Mot. 20.  However, Framaco represented, and DOS rationally accepted, that [***] would have the requisite [***] by [***], before project performance. AR 1269.

personnel listing prior projects and companies. AR 1059-81. These resumes describe in detail the current project of each key management personnel. Id. As the project commitments for each Framaco employee were submitted, Caddell has not shown that Framaco's omission of projects on the table skewed the technical evaluation or interfered with Framaco's ability to receive award. Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1380 (Fed. Cir. 2009); see AR 1059, 1062, 1065, 1068, 1070, 1074, 1077, 1080.[14]

Not every error in either an offeror's proposal or the procurement process warrants reversal of an award. See Labatt, 577 F.3d at 1380 (finding a proposal transmitted via email instead of paper when the Solicitation required a paper submission to be harmless error and not grounds for granting a protest); Andersen Consulting v. United States, 959 F.2d 929, 932-33 (Fed. Cir. 1992) (recognizing minor errors in the procurement process do not provide a basis for overturning an award because "[a]ny good lawyer can pick lint off any Government procurement" (internal citation and quotation marks omitted)).

**DOS Reasonably Found that Framaco's Proposal Met the Limitation on Subcontracting Provision of the Solicitation**

Caddell argues that Framaco's proposal demonstrates that Framaco would not "self-perform 50%" of the contract, and that the TEP's conclusion that Framaco would only subcontract [***]% of the work was unreasonable. Pl.'s Mot. 32. Defendant and Intervenor counter that Caddell's position is based on a "misperception that Framaco would not be performing any site management services." Def.'s Mot. 19; Framaco's Mot. 41.

Section L.23.2.2.6.3.5 of the Solicitation contains a limitation on subcontracting ("LOS") clause, stating:

> With respect to a diplomatic construction project, a prime contractor may not subcontract more than 50 percent of the total value of the project.

AR 332. An offeror fails to satisfy an LOS provision if it is "readily apparent" that its proposal fails to show that the offeror "would comply with the requirements of an LOS clause." Centech Grp., Inc. v. United States, 554 F.3d 1029, 1038-40 (Fed. Cir. 2009) (emphasis in original) (finding technically unacceptable an offeror's proposal stating that it would only perform 43.2 percent of the contract value when the LOS term required the offeror to perform 50 percent of the contract value); Hyperion, Inc. v. United States, 115 Fed. Cl. 541, 553 (2014).

---

[14]    Caddell states that it was initially given a technical rating of fail for Factor 4 Subfactor 2 because "some of the commitment dates ran into subsequent calendar years and did not clearly indicate that the key personnel would be available at the time of notice to proceed," and DOS permitted Caddell to cure this error via discussions. Pl.'s Resp. 13. Caddell argues that DOS acted arbitrarily and capriciously by not giving Framaco a fail rating on the same grounds. Id. (citing Cyios Corp. v. United States, 122 Fed. Cl. 726, 737 (2015)). However, Framaco's proposal was substantially different than Caddell's with respect to commitment dates. The error in Caddell's proposal stemmed from its key personnel's other project commitment dates extending far into the future - - such as June and November 2017, making it inexplicable how these key employees would be available to perform the Port Moresby project. AR 963-64. In contrast, Framaco's management personnel were listed as being available to "join after contract award." AR 491, 1057.

Unlike Centech Group, Caddell has failed to establish that it was "readily apparent" that Framaco would not satisfy the LOS clause. Rather, Framaco consistently represented in its initial and revised proposals that it would subcontract less than 50% of the total value of the project. AR 332, 549, 1021. Framaco is bound by this representation. Framaco also represented in its approved small business subcontracting plan that it would subcontract approximately [***]% of the $95 million total project value, and the dollar value attributed to subcontracting was approximately [***] million thus supporting this representation. AR 1219.54, 1215.64.

The record reflects that Framaco was not using Louis Berger as a subcontractor for site management, but instead was directly hiring Louis Berger employees - - making them Framaco employees - - to perform site management. AR 1006, 1012; see Chapman Law Firm v. United States, 63 Fed. Cl. 519, 526 (2005), aff'd 163 F. App'x 889 (Fed. Cir. 2006) (holding an offeror's representations regarding the roles of responsibility between the offeror and its subcontractors to be sufficient to comply with the LOS clause). Should Framaco fail to adhere to these subcontracting commitments and limitations during contract performance - - it will be an issue of contract administration. See Chapman, 63 Fed. Cl. at 527 (finding that "'the contractor's actual compliance with the [LOS] provision is a matter of contract administration.'" (quoting Coffman Specialties, Inc., B-284546, B-284546.2, 2000 WL 572693, at *4 (Comp. Gen. May 10, 2000))).

## DOS' Affirmative Responsibility Determination For Framaco Was Rational

On March 31, 2016, Caddell raised its third Phase II protest ground challenging DOS' affirmative responsibility determination for Framaco following the March 14, 2016 issuance of Algese I, a decision by the Court of Federal Claims that raised questions about the business integrity of Framaco's proposed subcontractor, Louis Berger Group. 125 Fed. Cl. at 431.

Algese I was a post-award bid protest contesting the Navy's award of a contract to Berger Group Holdings, Inc.'s subsidiary Louis Berger Aircraft Services, on the ground that the offeror "materially misrepresented and concealed its parent's long history of public corruption and fraud in government procurement." Id. at 434. The Algese I Court found that Louis Berger Aircraft Services supplied responsibility certifications that failed to disclose its parent corporation's history of fraud and corruption, and when that information came to light, it was irrational for the procuring agency to find Louis Berger Aircraft Services responsible and eligible for award. Id. at 443.[15] The Algese I Court attributed the fraud of the parent - - Berger Group Holdings, Inc. - - to all entities 100% controlled by the parent, including Louis Berger Group, Framaco's proposed subcontractor here. Id. The Algese Court remanded the protest to the Navy to "make an updated responsibility determination" of Louis Berger Aircraft Services. Remand Order, Algese 2 s.c.a.r.l. v. United States, No. 15-1279C (Mar. 29, 2016).

---

[15]     The Algese I Court found Louis Berger Aircraft Services' responsibility certifications constituted a material misrepresentation because Louis Berger Aircraft Services failed to report its parent corporation's principal's False Claims Act violations and its parent corporation's and affiliate's deferred prosecution agreements for violations of the Foreign Corrupt Practices Act. 125 Fed. Cl. 431, 445 (2016).

The <u>Algese I</u> Court noted that in 2010, the Louis Berger Group confessed to defrauding the United States by obtaining payment on fraudulent claims in violation of the False Claims Act and that the World Bank debarred Louis Berger Group in February 2015, for making corrupt payments to government officials in Vietnam.  125 Fed. Cl. at 435-36.  The <u>Algese I</u> Court further detailed the fraud prosecutions against two of Louis Berger Group's executives and the chairperson of Berger Group Holdings, Inc.  The Court also detailed the 2015 deferred prosecution agreement between Berger Group Holdings, Inc. and the New Jersey U.S. Attorney's Office, which covered violations of the Foreign Corrupt Practices Act from 1998 to 2010, and affected all subsidiaries of Berger Group Holdings, Inc.  <u>Id.</u> at 436; Order for Continuance, <u>United States of America v. Louis Berger Int'l, Inc.</u>, Mag. No. 15-3624 (D.N.J. July 7, 2015).  The <u>Algese I</u> Court concluded that Berger Group Holding's actions constituted "irregularities seriously reflecting on the propriety of further Federal Government dealings."  125 Fed. Cl. at 442 (internal citation and quotation marks omitted).

Prior to the <u>Algese I</u> decision, the Contracting Officer in the instant protest twice determined that Framaco was responsible with no mention of Louis Berger Group.  AR 1217, 1301.  In his original determination, the Contracting Officer noted that Framaco was "not listed on the Excluded Parties List from Federal Procurement and Non-Procurement Programs dated September 19, 2015."  AR 1217.  On November 20, 2015, following corrective action, DOS updated its responsibility determination, finding that Framaco was not on the "Excluded Parties List" as of November 19, 2015, and had a satisfactory record of integrity and business ethics.  The Contracting Officer further stated:

> Framaco's past performance record as shown in the Past Performance Information Retrieval System (PPIRS) shows ratings of Exceptional and Satisfactory for Framaco on all their listed projects.

AR 1301.

Given the role Framaco designated for Louis Berger Group in its proposal,[16] this Court directed the Government to bring the <u>Algese I</u> decision to the attention of the Contracting Officer so that he could assess whether this information had any impact on his responsibility determination of Framaco.  <u>See</u> Order (June 1, 2016).  On June 3, 2016, Defendant submitted a declaration from Contracting Officer David Vivian, stating that he had been unaware of Louis Berger's lengthy and well-documented public corruption until mid-way through this litigation.  Vivian Decl. ¶ 3 (June 2, 2016).  In its supplemental brief, Framaco stated that Louis Berger Group was not on the excluded parties list in September 2015, when Framaco submitted its offer and that Framaco had no knowledge of the circumstances related in <u>Algese I</u> until the decision was issued.  Framaco's Suppl. Br. 4; <u>see also</u> Tr. 94 (May 18, 2016).

Contracting Officer Vivian stated:

---

[16]     Besides listing Louis Berger Group as a subcontractor, Framaco was hiring two key personnel from Louis Berger Group for its proposed on-site management team.  AR 1057.

> After reviewing the [Algese I] decision, I determined that [Algese I] did not warrant conducting a new responsibility determination for Framaco because nothing in that case brought any of Framaco's required representations or certifications into question, nor did it cause me to doubt Framaco's business integrity.
>
> I further determined that no responsibility determination was necessary for Louis Berger because the solicitation did not require a responsibility determination for a proposed subcontractor, Louis Berger was not subject to a suspension or debarment, and [Algese I] made it clear that Louis Berger had taken steps to avoid future incidents of fraudulent conduct.

Vivian Decl. ¶¶ 4-5.

On remand from the Algese I Court, the Navy again found Louis Berger Aircraft Services responsible. On July 29, 2016, the Court issued a second opinion, Algese II, this time affirming the Navy's revised responsibility determination, noting that the Navy had considered 2,500 pages of new information. Algese II, 127 Fed. Cl. at 505. Based on a declaration by an Assistant U.S. Attorney, the Algese II Court found that all liabilities incurred by Louis Berger Group had been properly assumed by Louis Berger International. Id. at 503-04. The Court explained:

> [The protestor] asserts that "company" encompasses more than just Louis Berger International because the [2015] deferred prosecution agreement mentions two Louis Berger Group executives' culpable acts. However, the Contracting Officer decided that the executives' actions were properly attributable to Louis Berger International. Due to corporate restructuring, Louis Berger Group was collapsed into Louis Berger International. As the Department of Justice explained, it prosecuted Louis Berger International because it assumed all liability for the previous entity during the restructuring process.

Id. at 504 (internal citations omitted).

The Algese II Court found that the Navy had sufficiently described why Louis Berger Aircraft Services' responsibility certifications were not material misrepresentations. Id. at 500. In affirming the Navy's new responsibility determination, the Algese II Court noted that the Navy weighed and considered the voluminous information before it and that "[e]ven though the Court [might] not have reached the same conclusion as the Navy," the Court could not say that the Navy's determination was unreasonable or unlawful. Id.

Following Algese II, Caddell continued to protest DOS' affirmative responsibility determination for Framaco, arguing that Algese I still requires the Agency to make a new responsibility determination considering the effect of Louis Berger Group's "history of fraud on Framaco International, Inc.'s responsibility." Pl.'s Suppl. Br. 1; Pl.'s Mot. for a Prelim. Inj. 4-6. Caddell contends that Algese II does not alter the factfinding in Algese I or "absolve DOS of the errors committed in this procurement." Pl.'s Mot. for a Prelim. Inj. 4. Caddell further posits that the matter must be remanded to the Agency to directly make a responsibility determination of Louis Berger Group's responsibility in accordance with FAR 9.104-4.

FAR 9.104-4 provides:

(a) Generally, prospective prime contractors are responsible for determining the responsibility of their prospective subcontractors (but see 9.405 and 9.405-2 regarding debarred, ineligible, or suspended firms).[17]   Determinations of prospective subcontractor responsibility may affect the Government's determination of the prospective prime contractor's responsibility.  A prospective contractor may be required to provide written evidence of a proposed subcontractor's responsibility.

(b)  When it is in the Government's interest to do so, the contracting officer may directly determine a prospective subcontractor's responsibility (e.g., when the prospective contract involves medical supplies, urgent requirements, or substantial subcontracting).  In this case, the same standards used to determine a prime contractor's responsibility shall be used by the Government to determine subcontractor responsibilities.

48 C.F.R. § 9.104-4 (emphasis added).

Contracting officers are generally given wide discretion in making responsibility determinations, Impresa, 238 F.3d at 1334-35, and in deciding whether to assess a subcontractor's responsibility, contracting officers have heightened discretion.  FAR 9.104-4 provides that a contracting officer "may" directly determine a subcontractor's responsibility when it is in the Government's interest to do so.  48 C.F.R. § 9.104-4.  Here, the Contracting Officer, when made aware of the Algese I Court's findings regarding Louis Berger Group's and its parent corporation's "public corruption," assessed whether it was in the Government's interest to perform either a responsibility determination directly for Louis Berger Group or an additional assessment of Framaco's responsibility.   The Contracting Officer decided not to perform such additional responsibility assessments, reasoning:

After reviewing the [Algese I] decision, I determined that [Algese I] did not warrant conducting a new responsibility determination for Framaco because nothing in that case brought any of Framaco's required representations into question, nor did it cause me to doubt Framaco's business integrity.

I further determined that no responsibility determination was necessary for Louis Berger because the solicitation did not require a responsibility determination for a proposed subcontractor, Louis Berger was not subject to a suspension or debarment,

---

17      FAR 9.405 details the effects of a contractor being listed as debarred, suspended, or proposed for debarment in the System for Award Management database ("SAM"), and requires contracting officers to "review SAM Exclusions to ensure that no award is made to a listed contractor."   48 C.F.R. § 9.405 (2013).   FAR 9.405-2 restricts a prime contractor from subcontracting work to contractors that are debarred, suspended, or proposed for debarment "unless the agency head states in writing the compelling reasons for this approval action."   48 C.F.R. § 9.405-2(a) (2015).  As such, a prime contractor, with written agency approval, can hire a subcontractor even if that subcontractor has been debarred, suspended, or proposed for debarment. Id.

and [Algese I] made it clear that Louis Berger had taken steps to avoid future incidents of fraudulent conduct.

Vivian Decl. ¶¶ 4-5.

The Contracting Officer did not revisit the matter after the Algese II Court's affirmance of the Navy's responsibility determination for Louis Berger Aircraft Services. However, the Algese II decision was based on a substantially amplified record developed by the Navy and does not call into question the Contracting Officer's decision here not to directly review Louis Berger Group's responsibility - - it provides additional support.   As an Assistant U.S. Attorney from the Department of Justice's Criminal Division testified, Louis Berger Group had undergone a corporate restructuring process in which Louis Berger International assumed Louis Berger Group's "executives' culpable acts" and "all liability" under the 2015 deferred prosecution agreement. Algese II, 127 Fed. Cl. at 504.  The Contracting Officer's conclusion that Louis Berger Group had not been suspended or debarred and had taken steps to avoid future fraudulent conduct remained unaltered.  In addition, the role to be played by Louis Berger Group as Framaco's subcontractor was limited to support, not management, and there is no indication that the key personnel Framaco was hiring from Louis Berger Group had any role in the prior misconduct.

The Contracting Officer's decision that it was unnecessary to separately assess Louis Berger Group's responsibility or reassess Framaco's responsiblity was a judgment call supported by the record.  See Bender Shipbuilding & Repair Co. v. United States, 297 F.3d 1358, 1362 (Fed. Cir. 2002); John C. Grimberg Co., 185 F.3d at 1303; Acrow Corp. of Am. v. United States, 97 Fed. Cl. 161, 180 (2011) ("If the contracting officer believes . . . that [the subcontractor] . . . is no longer the company that committed these crimes and that the [prime contractor] is trustworthy to monitor its affiliate's actions going forward, the court cannot second-guess that decision." (internal citation and quotation marks omitted)).  Given the totality of information on Louis Berger Group related in Algese I and Algese II, and the permissive language in FAR 9.104-4, Plaintiff has failed to demonstrate that the Agency violated regulation or acted unreasonably in declining to separately assess Louis Berger's responsibility.  See Bender Shipbuilding, 297 F.3d at 1362.  "[T]his is not a situation where the [A]gency 'entirely failed to consider an important aspect of the problem,'" rather the Agency "is going into this procurement with its eyes wide open . . . ," and understands the history of Framaco's proposed subcontractor.  Ceres Envtl. Servs., Inc. v. United States, 97 Fed. Cl. 277, 306 (2011) (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); Commc'n Constr. Servs., Inc. v. United States, 116 Fed. Cl. 233, 272-73 (2014).

## Conclusion

Plaintiff's motion for judgment on the Administrative Record is **DENIED**.

Defendant and Intervenor Framaco's motions for judgment on the Administrative Record are **GRANTED**.

The Clerk is directed to enter judgment accordingly.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**